# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                    Case No. 15-32928-WRS
                                            Chapter 11

UNITED PLASTIC RECYCLING INC.,

        Debtor

## MEMORANDUM DECISION

This Chapter 11 case is before the Court on Applications for Professional Compensation and Expenses as follows:

<u>PROFESSIONAL FEES</u>

| | | |
|---|---|---:|
| 1. | Memory & Day | $544,900.00 |
| | (Doc. 492) filed 1/18/17 | |
| | Reduced | 490,410.00 |
| | (Doc. 607) filed 5/16/17 | |
| | | |
| 2. | Gilpin Givhan, PC | 122,390.00 |
| | (Doc. 498) filed 1/24/17 | |
| | Amended | 119,965.75 |
| | (Doc. 556) 3/16/17 | |
| | Reduced | 110,151.00 |
| | (Doc. 607) filed 5/16/17 | |
| | | |
| 3. | Reynolds, Reynolds & Little, LLC | 187,612.50 |
| | (Doc. 505) filed 1/26/17 | |
| | Reduced | 169,098.75 |
| | (Doc. 607) filed 5/16/17 | |

EXPENSES

| | | |
|---|---|---:|
| 1. | Memory & Day | $8,559.00 |
| | (Doc. 492) filed 1/18/17 | |
| | | |
| 2. | Gilpin Givhan, PC | 8,266.16 |
| | (Doc. 498) filed 1/24/17 | |
| | Amended (Doc. 556) 3/16/17 | 8,577.11 |
| | | |
| 3. | Reynolds, Reynolds & Little, LLC | 736.08 |
| | (Doc. 505) filed 1/26/17 | |

501K Recycling, LLC, ("501K"), an unsecured creditor but not a member of the Official Committee of Unsecured Creditors, objected to all of the professional fee applications listed above. (Doc. 520). 501K notes the Debtor-in-Possession ("DIP") filed this Chapter 11 case with a view to sell the assets as a going concern and it never intended to reorganize the company as a going concern. *Id.* 501K further notes the assets sold for $2,850,000, but the sale only netted $80,000 as Renasant Bank, a secured lender, received $2,770,000 on its secured claim. *Id.*

In addition to the losses suffered prior to the filing of the petition, there was approximately another $2,000,000 or so in operating losses suffered during the period of administration. Also, Renasant Bank filed an administrative claim of more than $1,000,000, which is presently pending. (Doc. 489). Lastly, more than a $1,000,000 in professional fees and expenses were incurred during the life of this liquidating Chapter 11. In the end, however, the Debtor realized only $80,000 on the sale of the plastic factory despite the significant investment of time and effort.

## I. FACTS

On October 16, 2015, United Plastic Recycling, Inc., and United Lands, LLC, filed petitions in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. (Case No. 15-32928, Doc. 1; Case No. 15-32926, Doc. 1). On November 20, 2015, the Court granted a motion for joint administration. (Doc. 67). While there are two separate cases and two separate Debtors, for purposes of these applications, the Court will refer to the Debtors collectively as *United Plastic* or *the Debtor*.

Probably the most accurate picture of the Debtor's situation at the time it filed the petition in bankruptcy is found in the Objection of Renasant Bank to Debtor's Motion Seeking Court Permission to Use Cash Collateral. (Doc. 60). As of the date of the petition, the total debt owed Renasant Bank ("Renasant" or "Bank"), on eight separate loans, is approximately $7.3 million. *Id.* Renasant also held mortgages and security interests in substantially all of the Debtor's property. *Id.*

The Debtor experienced operating losses from its business in the amount of $552,310 for the year 2014. *Id.* For the first nine months of 2015, it lost $1.7 million. *Id.* In addition to these operating losses, the Bank is concerned that the Debtor carried inventory on its books at $5.35 million, while, by the Bank's reckoning, the inventory was worth only $2.5 million at that time. *Id.* If the Bank is correct in its appraisal, the Debtor should have taken a nonoperating loss of an additional $2.85 million during the first nine months of 2015.

The Bank became alarmed at this state of affairs and called its loan. *Id.* After some discussions and extensions granted by the Bank, the loan became due on September 15, 2015. *Id.* The Debtor was not in a position to pay the loan and it could not refinance its debt. At that time, John Sullivan, owner of seventy-five percent (75%) of the stock in the Debtor, managed the Debtor corporation. *Id.* On September 23, 2015, Mr. Sullivan took his own life. John A. Bonham, Jr., owner of the remaining twenty-five percent (25%) share of the Debtor, became President and filed a petition in bankruptcy on October 16, 2015. The Debtor was in a dire situation at the time it filed its petition in bankruptcy. It was hemorrhaging cash, the Bank called its loan, it was unable to refinance its debt, and its seventy-five percent (75%) owner and former president recently died.

3

Upon Sullivan's death, the Debtor became the beneficiary of a $6,000,000 life insurance policy on his life. This $6 million, after the payment of costs of administration, would have been available for distribution to creditors. Moreover, this $6 million is a ready source of funds from which administrative expenses could be paid. The Court's concern is that the existence of these funds may have encouraged professionals to "churn" their bills, performing services that were not beneficial to the estate.

In response to the Court's concerns as to the amount of the professional fees and heavy post petition operating losses, counsel for the Official Committee of Unsecured Creditors filed a liquidation analysis supported by an independent appraisal of the Debtor's assets. (Doc. 551). The liquidation analysis shows all secured and administrative claims could have been paid, with $921,000 remaining for unsecured claims. This does not appear to include the insurance proceeds, which would add another $6,000,000 to the estate for distribution. The passage of time proved the liquidation analysis to be wildly inaccurate. Whether the professionals were justified in relying on this analysis at the outset of the case is a debatable point. However, it is indisputable that, over time, its inaccuracy should have become apparent.

## II. LAW

### A. Jurisdiction

This Court has jurisdiction to hear these matters pursuant to 28 U.S.C. § 1334(b). This is a core proceeding. 28 U.S.C. § 157(b)(2)(A). These are interim applications for compensation and are subject to adjustment until the case is closed. Accordingly, this is not a final order.

4

## B.  General Principles

Applications for compensation of professional persons are governed by the provisions of

11 U.S.C. § 330(a), which provides, as follows:

> (1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103—
>> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and
>> (B) reimbursement for actual, necessary expenses.
>
> (2) The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.
>
> (3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—
>> (A) the time spent on such services;
>> (B) the rates charged for such services;
>> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for—
(i) unnecessary duplication of services; or
(ii) services that were not—
(I) reasonably likely to benefit the debtor's estate; or
(II) necessary to the administration of the case.

The means by which a bankruptcy court evaluates an application for professional fees is well established. First, the court determines the "lodestar." *Bivens v. Wrap It Up, Inc. v. Nature's Way Café Franchising, LLC*, 548 F.3d 1348, 1351–52 (11th Cir. 2008). Applying the "lodestar" method, the court assesses the value and reasonableness of attorneys' fees by multiplying the number of hours reasonably necessary by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *Miller Buckfire & Co., LLC v. Citation Corp., (In re Citation Corp.)*, 493 F.3d 1313, 1317–19 (11th Cir. 2007); *Stroock & Stroock & Lavan v. Hillsborough Holdings Corp., (In re Hillsborough Holdings Corp.)*, 127 F.3d 1398, 1401– 02 (11th Cir. 1997). The Eleventh Circuit favors the consideration of the *Johnson* factors in determining the lodestar. *Bivins*, 548 F.3d at 1351–52 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). In addition to the *Johnson* factors, in bankruptcy cases, the court "must also consider whether the bankruptcy assets were administered as economically as possible and whether any of the services rendered were duplicative or non-legal." *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 878 (11th Cir. 1990) (citing *Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1201 (5th Cir.1981). Given the 1994 amendment to § 330, the court assesses necessity and reasonableness of attorneys' fees at the time they were rendered. *Barron & Newburger, PC,*

6

*v. Texas Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 276 (5th Cir. 2015). Second, if the court

determines the fees claimed are unreasonable, the court may either: (1) conduct an hour-by-hour

review of the attorney's fees or (2) apply an across-the-board reduction to the fees. *Bivens v.*

*Wrap It Up, Inc. v. Nature's Way Café Franchising, LLC*, 548 F.3d 1348, 1351–52 (11th Cir.

2008); *see Padurjan v. Aventura Limosine & Transp. Service, Inc.*, 411 Fed. Appx. 684, 687 (11th

Cir. 2011); *see also Alhassid v. Bank of America, N.A.*, 688 Fed. Appx. 753, 759 (11th Cir. 2017).

Where the fee application is voluminous, an across-the-board reduction may be the most efficient

and effective use of judicial resources. *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994).

### C. Memory and Day

Applying these principles, the Court begins with several observations. Memory and Day

are counsel for the Debtor-in-Possession. As counsel, they are bound to zealously represent their

client. Ala. R. Prof. Conduct Preamble. Having a duty to zealously advocate is not a license to

advocate unnecessarily nor unreasonably. *See* Ala. R. Prof. Conduct Preamble. In reviewing

counsels' representation, the Court is required to consider "whether the services were necessary to

the administration of, or beneficial at the time at which the service was rendered toward the

completion of, a case under this title." 11 U.S.C. § 330(a)(3)(C).

The interests of the Debtor-in-Possession, the unsecured creditors, and the secured

creditors naturally conflict at times. The President of the Debtor-in-Possession was interested in

continuing business operations during the course of liquidating the Debtor's assets, as is often the

case. However, it does not appear that there was ever any hope of a distribution to equity holders.

As such, the Court is immediately skeptical as to why the Debtor-in-Possession was interested in

remaining in business to liquidate its assets. If all the Debtor-in-Possession was interested in

doing was keeping a job for its President and key employees for eighteen months, that end was achieved at a tremendous cost to the unsecured creditors and likely not always necessary nor beneficial to the completion of the case.

On the other hand, at the time the petition was filed, the affairs of the Debtor were in considerable flux. At the outset of the case, the decision to proceed with a sale of the assets in the context of a Chapter 11 case may not have been unreasonable. Over time, however, it became apparent that the assets would not sell for as much as was hoped. Having set its course, it may have appeared unreasonable to change course and convert the case to a case under Chapter 7, effectively wasting the efforts expended to date. Admittedly, counsel for the Debtor faced quite the predicament, spending large amounts of money to keep the Debtor afloat while holding out hoping its assets would sell for enough to justify the delay.

Over the course of fifteen months, Memory and Day billed a total of 1,654.6 hours, which amounted to $544,900.00 in professional fees. (Doc. 492). Memory and Day subsequently filed an amended fee application reducing its request for compensation by ten percent (10%). (Doc. 607). Considering the Debtor's plastic factory sold for $80,000 more than the amount owed on the mortgage and significant operating losses were incurred while the property was marketed for sale, the Court finds the total hours expended by Memory and Day are unreasonable and unnecessarily high. After reviewing the case history, the efforts expended by Memory and Day as Debtor's counsel, the reasonableness of those efforts at that time, and the results obtained, the Court will further reduce Memory and Day's fee by an additional ten percent (10%). Accordingly, the Court will allow compensation in the fair and reasonable amount of $441,369.

8

**D. Gilpin Givhan, PC**

Gilpin Givhan, PC ("Gilpin") was hired as special counsel due to their familiarity with the Debtor and the Debtor's business. Gilpin seeks $128,542.86 for fees and expenses. (Doc. 556). Gilpin reduced their application by ten percent (10%) to $110,151.00. (Doc. 607). The Court has carefully examined Gilpin's application and is concerned about two matters. First, this is an asset sale, yet Gilpin spent a considerable amount of time on "due diligence" and "data room matters." *Id.* The point of 11 U.S.C. § 363 is to sell assets quickly and inexpensively for maximum value. Sales made pursuant to § 363 are not subject to rights of redemption, which is attractive to purchasers. Furthermore, § 363 has mechanisms to sell assets while resolving any disputed liens or interests, either free and clear or subject to specified liens. 11 U.S.C. § 363(f). Sales pursuant to § 363 are quite clean, as opposed to the purchase of the stock in a going concern business, where the purchaser may be on the hook for undisclosed liabilities. It appears that much of Gilpin's work was done under the assumption that work necessary in the sale of a corporation outside of § 363 is also necessary in a § 363 sale. This is a false assumption; thus, much unnecessary work was done and a significant reduction in fees is appropriate.

Second, in reviewing Gilpin's application, the Court detects little or no attempt to avoid duplicating efforts of Memory and Day, counsel for the Debtor. For example, on 11/11/15, Gilpin reports 6.7 hours for work on schedules. On 11/20/15, Gilpin reviewed loan documents for 4.9 hours. On 3/04/15, Gilpin spent 1.5 hours working on the file. Gilpin should have been selling assets, not flyspecking loan documents and the file.

Considering Gilpin's application as a whole, it appears that much of the work done is unnecessary and did not advance the sale of the assets, which is the reason Debtor hired Gilpin. In

9

addition, it appears that there is significant duplication of effort with Memory and Day. 11 U.S.C. § 330(a)(4)(A) (stating that the court shall not allow unnecessary duplication of services). In addition to the ten percent (10%) reduction pursuant to the motion filed May 16, 2017, (Doc. 607), the Court will reduce the amount allowed by an additional 35%. Gilpin's application for compensation will be allowed in the fair and reasonable amount of $71,598.00.

### D. Reynolds, Reynolds, & Little, LLC

Reynolds, Reynolds, & Little, LLC, ("Reynolds") filed an application seeking $187,612.50 for its services as counsel for the Official Committee of Unsecured Creditors ("Committee"). (Doc. 505). In reviewing this application, the Court finds it necessary to first define the Committee's interests. Upon first glance, one might assume that the Committee's overriding interest is to maximize the recovery on unsecured claims. However, as the Debtor proposed to proceed by way of a liquidating Chapter 11 case, the first consideration is whether a § 363 sale is a good decision. From the Committee's lack of opposition against a § 363 sale, the Court assumes that the Committee and Reynolds approved of a liquidating Chapter 11. Liquidating Chapter 11s are notorious for dragging on too long, costing too much in the way of administrative expenses and operating losses, and yielding too little in the recovery on the sale of assets. In short, all of the things that happened here. Interestingly, 501K, the objecting creditor, did not criticize Reynolds' decision not to request the conversion of this case to one under Chapter 7 at the outset. The Court further notes that the value of the Debtor's assets was wildly overstated in the Schedules, which is the first place one looks when evaluating a bankruptcy case. While it may not be Reynolds' fault the Committee was hoodwinked here, the Court does criticize Reynolds'

apparent lack of caution.  That is, the Court does not see any evidence, in the record, fee

application, or elsewhere, of Reynolds' efforts to minimize the risk to unsecured creditors.  *See In*

*re Dunkin's Diamonds, Inc.*, 420 B.R. 883, 888 (Bankr. M.D. Fla. 2009) (stating counsel for the

Official Unsecured Creditors Committee has a duty to keep professional costs to a minimum,

consistent with the complexities of the case).

Upon further review of Reynolds' actions, one might surmise that the unsecured creditors

were interested in continuing to do business with the Debtor as an ongoing concern, and hoping to

do business with the Debtor during the period of administration and the purchaser after the sale of

the assets was closed.  Indeed, the Court notes that many of the claims filed during the period of

administration were made by creditors who held large unsecured claims. For example, 501K, the

creditor who filed the objections to the applications for professional fees, did itself file an

administrative period claim.  (Doc. 137).

One of the fundamental purposes of the Committee is to monitor the progress of the case

to ensure that unsecured creditors receive the highest value possible.  This purpose is often

typically carried out by counsel approved by the Court to represent the Committee.  Naturally, the

Court expects counsel to bill for such monitoring; however, this is not a license to sit, watch, and

bill.  If counsel spends an exorbitant amount of time monitoring the case but accomplishes next to

nothing for the unsecured creditors, then counsel's services cannot be said to be necessary or

reasonable.  Upon reviewing Reynolds' application, it appears that counsel spent a significant

amount of time reviewing and monitoring the case.  Unfortunately for the unsecured creditors,

Reynolds' monitoring did not benefit the Committee.

11

Furthermore, Reynolds' application is replete with attorney entries for work pertaining to matters better left to a paralegal, administrative staff, or someone billing a lesser fee. For example, an attorney at Reynolds billed extensive hours uploading documents to "Dropbox." (e.g. Doc. 505-1, pp. 23, 26, 27, 71). Time was also billed for sending Dropbox invitations. (e.g. Doc. 505-1, p. 23). At other times, counsel billed for time spent sending invitations to Committee members for conference calls. (e.g. Doc. 505-1, p. 23). Counsel even submitted billing entries for phone calls and emails to Chambers to inquire about the status of a Court Order, once even billing for two emails pertaining to the same matter on the same day. (Doc. 505-1, pp. 44, 47). It is unreasonable for counsel to bill $225 per hour for such tasks.

Throughout the course of this case, the Court was frequently dismayed at Reynolds' posture in constantly dogging the Debtor and its counsel, while giving the Bank a free pass. Most of the Debtor's assets appear to have been encumbered by mortgages and security interests in favor of the Bank. One might have expected to see, early in the case, several hours charged to review of the mortgages, security agreements, financing statements, and the like. The Court does not see any time charged to such efforts. Either counsel did not charge for these services, a dubious assumption in light of the remainder of the bill for services rendered, or Reynolds accepted the Bank's claim that it was secured by all of the Debtor's assets at face value.

If this Chapter 11 case was promptly converted to a case under Chapter 7, the Trustee would have abandoned the encumbered assets after determining that the Bank in fact held a security agreement and the assets could not be sold for a price sufficient to generate a surplus after satisfaction of security interests and administrative costs. Abandoning the assets would cause the Bank to incur considerable costs in taking and liquidating its collateral. Instead, the Committee

has, so far, permitted the Bank to free ride on the efforts of the Debtor.  To date, the Bank has

done nothing more that sit back and wait for money to appear, all the while squeezing the Debtor

for all it can in the way of adequate protection payments on its cash collateral.  Distressed

borrowers such as the Debtor in this case have little bargaining power.  The Committee might

have acted as a useful counterweight to the Bank's rapacious demands; yet, it did not do so.   It

goes without saying that every dollar taken by the secured lender is one dollar less for distribution

to unsecured creditors.

It is also worth pointing out that when property is sold pursuant to 11 U.S.C. § 363, as was

the case here, the sale is not subject to a one-year redemption period as is the case when property

is sold at a foreclosure sale.  In some cases, mortgagees are quite interested in § 363 sales to free

up the property and maximize its value, while minimizing costs of holding property.  It does not

appear that the Bank in this case paid for this benefit either.  Again, the Committee missed

another opportunity to drive a better bargain for the benefit of the unsecured creditors.

Despite billing over 800 hours to date, it appears to this Court that counsel for the

Committee did not advance the Debtor's case, provide value to the Debtor, or provide a distinct

benefit or increase in value to the Official Committee of Unsecured Creditors.  In addition to the

ten percent (10%) reduction pursuant to the motion filed May 16, 2017, (Doc. 607), the Court will

reduce the amount allowed by an additional forty percent (40%).  Reynolds' application for

compensation will be allowed in the fair and reasonable amount of $101,459.25.

### III. CONCLUSION

For the reasons stated above and pursuant to 11 U.S.C. § 330, the applications for

professional fees will be approved by way of a separate order in the following amounts:

| | | |
|---|---|---|
| 1. | Memory & Day | $441,369.00 |
| 2. | Gilpin Givhan, PC | $ 71,598.00 |
| 3. | Reynolds, Reynolds, & Little, LLC | $101,459.25 |

Additionally, the expenses represented in these application will be approved as the Court finds they were necessarily incurred during the course of this case.

Done this 28th day of September, 2017.

United States Bankruptcy Judge

c: Von G. Memory, Attorney for Debtor
   Gilpin Givhan PC
   J. Heath Loftin
   Robert D. Reynolds